Shane Brun (SBN 179079)
sbrun@venable.com
Alper T. Ertas (SBN 264120)
atertas@venable.com
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone:    415.653.3750
Facsimile:    415.653.3755

Attorneys for Defendant
F5 Networks, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Proven Networks, LLC<br><br>    Plaintiff,<br><br>    v.<br><br>F5 Networks, Inc.<br><br>    Defendant. | Case No. 5:20-cv-02521-LHK<br><br>**DEFENDANT F5 NETWORKS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS**<br><br>Date: October 15, 2020<br>Time: 1:30 p.m.<br>Judge: Hon. Lucy H. Koh<br>Dept.: Courtroom 8 |

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that on Thursday October 15, 2020, at 1:30 p.m. or as soon thereafter as this motion may be heard, in the United States District Court for the Northern District of California located at the United States Courthouse, 280 South 1st Street, San Jose, California 95113 in Courtroom 8, before Honorable Lucy H. Koh, Defendant F5 Networks, Inc. ("F5") will and hereby moves the Court to dismiss with prejudice Proven Networks, LLC's ("Proven") complaint for patent infringement ("Complaint") for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth in the attached Memorandum of Points and Authorities, the asserted claims of the asserted patents are directed to patent ineligible subject matter under 35 U.S.C. § 101. This motion is based on this Notice of Motion and Motion to Dismiss, the enclosed Memorandum of Points and Authorities, all papers and pleadings on file in this action, all matters of which the Court may take judicial notice and such other pleadings, evidence and argument as may be considered by the Court.

# Table of Contents

I. INTRODUCTION ................................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................................. 2

    A.    The Parties ................................................................................................................ 2

    B.    The '507 Patent ......................................................................................................... 2

III. LEGAL STANDARDS ..................................................................................................... 4

    A.    Rule 12(b)(6) Motion to Dismiss .............................................................................. 4

    B.    Section 101 Patent Eligibility Standard ................................................................... 5

IV. THE CLAIMS OF THE '507 PATENT ARE INELIGIBLE UNDER § 101 .................... 6

    A.    Claim 1 of the '507 Patent is Representative of the Asserted Claims. .................... 6

    B.    *Alice* Step One: The '507 Claims Are Directed to The Abstract Idea of Applying Rate-Limit Rules to a Stream of Data. ................................... 7

        1.    The claims are not directed to an improvement in computer functionality. ........................................................................... 9

        2.    Federal courts and agencies have held similar rule-based claims abstract. ................................................................................... 11

    C.    *Alice* Step Two: The Asserted Claims Do Not Contain an Inventive Concept. ................................................................................................ 12

        1.    The claims utilize conventional components to carry out an abstract idea. ................................................................................... 12

        2.    The claims fail the "machine-or-transformation" test. ....................... 13

    D.    The Dependent Claims Add Nothing More. .......................................................... 13

V. THE '852, '024, AND '786 PATENT CLAIMS ARE INELIGIBLE UNDER §101 ......................................................................................................................................... 15

VI. CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
    838 F.3d 1253 (Fed. Cir. 2016) ................................................................................................. 5

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ........................................................................................................ passim

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ................................................................................................................ 13

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019) ................................................................................................. 10

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ............................................................................................ 4, 7

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020) ........................................................................................... 2, 11

*FairWarning IP, LLC v. Iatric Systems, Inc.*,
    839 F.3d 1089 (Fed. Cir. 2016) ............................................................................................... 11

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) ...................................................................................... 2, 4, 11

*Intellectual Ventures II LLC v. JP Morgan Chase & Co.*,
    2015 WL 1941331 (S.D.N.Y. 2015) ....................................................................................... 11

*In re Bilski*,
    545 F.3d 943 (Fed. Cir. 2008) ................................................................................................. 13

*In re TLI Communications LLC Patent Litigation*,
    823 F.3d 607 (Fed. Cir. 2016) ........................................................................................... 11, 14

*McRO, Inc. v. Bandai Namco Games America Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ................................................................................................. 9

*Papasan v. Allain*,
    478 U.S. 265 (1986) .................................................................................................................. 5

*PersonalWeb Technologies LLC v. Google LLC*,
    2020 WL 520618 (N.D. Cal. 2020) ..................................................................................... 9, 10

*RecogniCorp, LLC v. Nintendo Co.*,
   855 F.3d 1322 (Fed. Cir. 2017) .................................................................................. 2, 5, 6

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ............................................................................................ 4

*Smart Systems Innovations, LLC v. Chicago Transit Authority*,
   873 F.3d 1364 (Fed. Cir. 2017) ................................................................................ 8, 11, 13

*Square, Inc. v. Protegrity Corp.*,
   CBM2014-00182, Paper 60 (U.S.P.T.O. Mar. 2, 2016) ..................................................... 11

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017) .................................................................................. 5, 6, 12

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014) ............................................................................................ 13

*Voip-Pal.com, In. v. Apple Inc.*,
   411 F. Supp. 3d 926 (N.D. Cal. 2019) ................................................................................. 5

**Statutes**

35 U.S.C. § 101 .............................................................................................................. *passim*

**Rules**

Federal Rule of Civil Procedure 12(b)(6), F5 ............................................................... 1, 4, 5

# MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Federal Rule of Civil Procedure 12(b)(6), F5 Networks, Inc. ("F5"), by and through undersigned counsel, respectfully moves to dismiss with prejudice Proven Networks, LLC's ("Proven") Complaint, asserting infringement of U.S. Patent Nos. 8,165,024 ("the '024 patent"), 8,018,852 ("the '852 patent"), 7,877,786 ("the '786 patent") and 7,450,507 ("the '507 patent") (collectively "Asserted Patents"), for failure to state a claim upon which relief can be granted. The Asserted Patents claim a series of abstract ideas with no tangible inventive concept eligible for patentability under 35 U.S.C. § 101 ("Section 101"). As F5's response to Counts I-III of Proven's Complaint, alleging infringement of the '852, '024 and '786 patents, F5 hereby incorporates by reference and adopts Extreme Networks, Inc.'s motion to dismiss filed in related Case No. 5:20-cv-02067-LHK, Dkt No. 27: ("Extreme Networks' Motion to Dismiss"). For the reasons discussed in Extreme Networks' Motion to Dismiss, the claims of the '852, '024 and '786 patents are ineligible for patentability under Section 101. The claims of the '507 patent are also patent ineligible under Section 101 as discussed below.

## I. INTRODUCTION

The test for determining whether patent claims are eligible for patent protection under Section 101 is a two-step process. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216-18 (2014). The '507 patent fails both steps of that test. First, the claims of the '507 patent are directed to the abstract idea of applying rate-limit rules to a stream of data in a computer network. Dkt. No. 1-7: ("'507 patent") at Abstract ("[**r**]*ate-limiting* a *traffic* stream using a rate limit hierarchy") (emphasis added); *see also Id.* at 2:31-32 ("[a] technique for rate-limiting a traffic stream using a rate-limit hierarchy"). While the claims relate to computer networks, the abstract concept of applying rate-limit rules to a stream of data is akin to managing vehicular traffic over the Bay Bridge through different classes of lanes (*i.e*., cash, FasTrak, and carpool lanes) and metering lights.

At *Alice* step two, the '507 patent adds nothing inventive to the abstract idea of applying rate-limit rules to a stream of data. The claims recite generalized terms (*e.g*., "subjecting a packet

to a first rate-limit check") and describe generic computing components in terms of their desired results (*e.g.,* "a classification engine configured to identify traffic classification of a packet" and "a rule selection engine configured to identify rules . . .") without providing any specific solution for achieving those results or for improving technology. *See RecogniCorp, LLC v. Nintendo Co.,* 855 F.3d 1322, 1326-27 (Fed. Cir. 2017). The claims of the '507 patent are comparable to claims the Federal Circuit found ineligible in *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.,* 955 F.3d 1317 (Fed. Cir. 2020) (claims for controlling access to computer resources) and *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316-18 (Fed. Cir. 2016) (claims directed to the application of generic business rules for controlling delivery of email). Like these and many other claims reciting generic data delivery and access rules held ineligible by the Federal Circuit, the claims of the '507 patent are directed to an abstract idea and lack any inventive concept sufficient to transform those claims into patent-eligible inventions. *See Alice,* 573 U.S. at 215-22 (citing *Mayo* at 132 S.Ct., at 1294, 1298).

## II. FACTUAL BACKGROUND

### A. The Parties

F5 provides enterprise-grade application hardware and software facilitating the delivery, security, performance and availability of web applications, computing storage and network resources. F5 is a global company with a large product development presence in the Bay Area, including development centers in San Jose, Santa Clara and San Francisco, California.

Plaintiff Proven, formerly known as the patent investment entity RAK Investments III, LLC ("RAK"), does not make or sell any products or services. Proven's counsel Russ August & Kabat LLP is a named partner in RAK and an interested party to this lawsuit. *See* Dkt. No. 6. Proven has filed one or more of the Asserted Patents against eleven other technology companies in this District and the Western District of Texas.

### B. The '507 Patent

The purported invention disclosed by the '507 patent "relates to hierarchal rate-limiting at a network node", and more particularly to a "hardware-based bandwidth borrowing scheme."

'507 patent at 1:12-14; *see also* 2:26-28. The specification explains that conventional and prior "[h]ierarchal rate-limiting [techniques were] used to control the flow of traffic streams at a network node by subjecting a traffic stream to more than one rate-limit check" (*Id*. at 1:19-21) as follows:

> The number of rate-limit checks that a traffic stream is subject to typically depends on the number of classifications to which the traffic stream belongs. For example, an [*sic*] Hypertext Transport Protocol (HTTP) traffic stream (i.e., a WEB traffic stream) between a WEB server and a WEB browser can be classified as WEB traffic based upon its Transmission Control Protocol (TCP) port number. The HTTP traffic stream can also be classified as TCP traffic based upon its Internet Protocol (IP)-protocol type. Thirdly, the HTTP traffic stream can also be classified as belonging to a specific IP-Subnet based upon its source and/or destination IP addresses.

*Id*. at 1:21-32.

According to the specification, "[p]roblems with the hierarchal rate-limiting scheme are encountered when a certain classification of traffic is over-subscribed." *Id*. at 1:49-51. But "[i]n software, it is possible to provide for oversubscription of certain classifications of traffic such that when a classification exceeds its own rate limit, the classification is permitted to borrow available bandwidth from the allocated rate limit of their parent classification."[1] *Id*. at 1:51-55. Such bandwidth borrowing was known and "relatively easy to implement in software" but "it [was apparently] much more difficult to efficiently perform the same operation in hardware." *Id*. at 1:57-59. According to the '507 patent, "a rate-limiting borrowing scheme in hardware typically requires a 'series plus parallel' check on two rate-limit buckets." *Id*. at 1:59-62. But "[i]n most cases [this approach] … causes additional latency for the traffic and/or [requires] additional complexity in hardware to make [it work] at the desired speeds." *Id*. at 1:67-2:3. And "[w]hile it may be possible to design complex hardware logic to achieve borrowing, complex

---

[1] "A parent classification is the next higher level traffic classification in a rate-limiting hierarchy." *Id*. at 1:55-57.

hardware logic is not efficient in terms of chip real estate and processing resources." *Id*. at 2:22-25.

Therefore, according to the '507 patent, "in view of the need for efficient hierarchal rate-limiting, a hardware-based bandwidth borrowing scheme [was] needed." *Id*. at 2:26-28.  The '507 patent's purported solution to this stated need was the following:

> A technique for rate-limiting a traffic stream using a rate limit hierarchy involves utilizing infinity rate limiting rules at child classification levels to allow borrowing of available bandwidth from a rate-limit rule in a parent classification. The infinity rate-limit rules at the child classification levels grant an automatic 'pass' at each child classification level regardless of the outcome of the actual rate-limit check of the child classification level. As a result of the automatic passes at each child classification, a packet is granted an overall pass if the packet passes the rate-limit check at the parent classification level.

*Id*. 2:32-42.

But as discussed below, the '507 patent does not describe or offer anything inventive or any improvements to then-existing technology or computing processes. In reality, the claimed infinity rate-limit check, the operation of which is not explained in the specification, is no check at all. Rather, it is defined only by its result, which is an "automatic" pass of the "*actual* rate-limit check" (*Id*. at 2:38) (emphasis added) at the child classification level. An automatic pass at the second level rate-limit check leaves the pass/fail decision for a data packet solely to the rate-limit check at the first level. *Id*. at 2:35-42.

**III. LEGAL STANDARDS**

**A. Rule 12(b)(6) Motion to Dismiss**

Patent eligibility under Section 101 is a question of law. *See Intellectual Ventures I*, 850 F.3d at 1338. It is a threshold issue "frequently … resolved on a Rule 12(b)(6)" motion before formal claim construction, when there are no disputed facts and a "full understanding of the basic character of the claimed subject matter" exists. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (claims found ineligible on the pleadings); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed.

Cir. 2014) (affirming grant of motion to dismiss prior to formal claim construction); *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) (same result*); Voip-Pal.com, In. v. Apple Inc*., 411 F. Supp. 3d 926, 932 (N.D. Cal. 2019) (same result). When evaluating a Rule 12(b)(6) motion to dismiss, courts may accept well-pleaded facts as true, but "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

**B. Section 101 Patent Eligibility Standard**

Section 101 defines patent-eligible subject matter with an "important implicit exception." *See Alice*, 573 U.S. at 216. "[A]bstract ideas are not patentable." *Id*. (citations omitted). *Alice* provides a two-step analytical framework to determine patent eligibility. At step one, the analysis is whether the asserted claims are directed to an abstract idea. *Id.* at 218. This step requires identification of the core "'focus of the claimed advance over the prior art' [and] if the claim's 'character as a whole'" is directed to an abstract idea. *Affinity Labs of Texas, LLC v. DIRECTV, LLC,* 838 F.3d 1253, 1257 (Fed. Cir. 2016). Patent-eligible claims must recite "'a specific means or method' for improving technology," instead of "an abstract end-result" or "'generalized steps… performed on a computer using conventional computer activity.'" *RecogniCorp,* 855 F.3d at 1326-27 (citations omitted).

At step two, the analysis is whether the claims, viewed both individually and as an ordered combination, contain something "significantly more" that amounts to an "'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible" invention. *Alice,* 573 U.S. at 215-22 (citing *Mayo* at 132 S.Ct., at 1294, 1298). "Stating an abstract idea while adding the words 'apply it with a computer'" is not enough to impart patent eligibility. *Alice,* 573 U.S. at 223. "Nor is limiting the use of an abstract idea 'to a particular technological environment'" *Id*. As discussed below, the '507 patent's attempt to obtain patent protection for the conventional and abstract idea of applying rate-limit rules to a stream of data simply by applying it in generic and conventional hardware is at direct loggerheads with these foundational principles of *Alice*. The use of "result-based functional language" in the claim without a clear

recitation of a nonconventional solution achieving the desired result equally fails step 2 of the analysis. *Two-Way Media,* 874 F.3d at 1338-39 (citations omitted). "To save a patent at step two, an inventive concept must be evident [and recited] in the claims." *RecogniCorp,* 855 F.3d at 1327.

**IV. THE CLAIMS OF THE '507 PATENT ARE INELIGIBLE UNDER § 101**

The claims of the '507 patent are not patent-eligible because: (1) they are directed to the abstract idea of applying rate-limit rules to a stream of data, and (2) they offer no technological improvement. The claimed *infinity rate limit check* is described in the specification only by its result of providing an automatic pass for a different rate-limit rule. The remaining limitations of the '507 claims recite generalized and well-known operations (*e.g.*, "subjecting a packet to a first rate limit check") and describe generic computing components in terms of their desired results (*e.g.*, "a classification engine configured to identify traffic classification of a packet" and "a rule selection engine configured to identify rules . . ."), without providing any specific solution for achieving those results. Neither the specification nor the claims provide any "specific means or method" for improving conventional rate-limiting processes or rules, or improvements in technology or computer functionality.

**A. Claim 1 of the '507 Patent is Representative of the Asserted Claims.**

Proven's Complaint asserts claims 1-20 of the '507 patent against F5. For the purpose of assessing patent eligibility under Section 101, claim 1, reproduced below, is representative of limitations recited by all asserted claims.[2]

> **1.** A method for rate-limiting a traffic stream using a rate-limit hierarchy at a network node comprising:
>
> **subjecting a packet to a first rate-limit check**, said first rate-limit check corresponding to a first-level traffic classification;

---

[2] Although claim 1 is representative of the other claims of the '507 patent, this motion addresses each of the claims in the patent in detail below. As shown, claim 13 is ineligible for the same reasons that claim 1 is ineligible, and the dependent claims add nothing new.

> **subjecting said packet to a second rate-limit check and an infinity rate-limit check**, said second rate-limit check and said infinity rate-limit check corresponding to a second-level traffic classification;
>
> **granting an automatic pass to said packet** from said infinity rate-limit check regardless of whether or not said packet passes said second rate-limit check; and
>
> **granting an overall pass** of said rate-limit hierarchy if said packet passes said first rate-limit check, even if said packet fails said second rate-limit check.

The Court may assess patent eligibility under Section 101 based on a representative claim if all claims are "substantially similar and linked to the same abstract idea." *See Content Extraction*, 776 F.3d at 1348 (citations omitted). Like claim 1, all asserted claims in this case are directed to the same abstract idea discussed below.

### B. *Alice* Step One: The '507 Claims Are Directed to The Abstract Idea of Applying Rate-Limit Rules to a Stream of Data.

The claims of the '507 patent are directed to the abstract idea of ***applying rate-limit rules to a stream of data in a computer network***. The elements of method claim 1 require the following basic steps:

(1) subjecting a packet to a first rate-limit check at a first-level traffic classification;

(2) subjecting the packet to a second rate-limit check and an infinity rate-limit check at a second-level traffic classification;

(3) granting the packet an automatic pass at the second level from the infinity rate-limit check even if it would have otherwise failed the second rate-limit check; and

(4) granting an overall pass to the packet if it passes the first rate-limit check.

*See* '507 patent at claim 1.

System claim 13 uses generalized components and functional language to accomplish the same abstract operations of claim 1. *See e.g.,* '507 patent at claim 13 ("a classification engine configured to identify traffic classification of a packet" and "a rule selection engine configured to identify rules . . ."). In sum, independent claims 1 and 13 apply a first rate-limit check to a first-level traffic classification and a second rate-limit check to a second-level traffic classification,

which is rendered moot – if applied at all – by the automatic pass granted at the second-level courtesy of the infinity rate-limit check.

The claimed first and second rate-limit checks are just generic and well-known rate-limit rules. *See* '507 patent at 3:1-2 ("first rate-limit rule corresponding to a first-level traffic classification"); 3:7-9 ("second rate-limit rule corresponding to a second-level traffic classification"); 4:58-59 ("A rate-limit check is the application of a rate-limit rule to a packet."). Applying one or more rate-limit rules to a generic class of traffic is nothing new and is in fact a primary feature of conventional hierarchal rate-limiting systems described in the background of the specification. '507 patent at 1:36-37 ("In a hierarchal rate-limiting scheme, the traffic stream in question must satisfy rate-limit checks"). Borrowing bandwidth by traffic class with the use of rate-limit rules was also a known operation. *See* '507 patent at 1:19-24 (admitting "[h]ierarchal rate-limiting [was already] used to control the flow of traffic streams … by subjecting a traffic stream to more than one rate-limit check [per class]); *see also* 1:51-55 (admitting "it [was already] possible to provide for oversubscription of certain classifications of traffic such that … the classification is permitted to borrow available bandwidth from … their parent classification").

Stripped of the admittedly conventional, non-inventive elements, the focus of the '507 claims is on the infinity rate-limit check and resulting automatic pass at the second-level traffic classification. *Smart Systems Innovations, LLC v. Chicago Transit Authority*, 873 F.3d 1364, 1371 (Fed. Cir. 2017) ("[s]tripped of the technical jargon that broadly describes non-inventive elements … and further shorn of the typically obtuse syntax of patents, the patents here really only cover an abstract concept"). But as discussed above, the infinity rate-limit check is no less vague and abstract than the claimed first and second rate-limit checks. Rather, the claimed infinity rate-limit check is a hypothetical test described solely in terms of its result – an automatic pass for second rate-limit check applied at the second level. In reality, the infinity rate limit check appears to be a non-existent test with a predetermined result of "pass." At their core, the claims of the '507 patent grant or deny a pass to a data packet based on the generic "first rate-

limit check" applied to a "first-level traffic classification." *See, e.g.* '507 patent at claim 1 ("granting an overall pass … if said packet passes said first rate-limit check, even if said packet fails said second rate-limit check").

Unlike the specific solution-based rules addressed by the Federal Circuit in *McRO*, the claims of the '507 patent merely apply a generic rate-limit rule to pass a packet. *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299, 1313-1316 (Fed. Cir. 2016) (claims held non-abstract due to a specific set of rules for animating lip synchronization with meaningful requirements, including a morph weight set stream as a function of phoneme applied to a sub-sequence); *see also PersonalWeb Technologies LLC v. Google LLC*, 2020 WL 520618 at *11-12 (N.D. Cal. 2020)(distinguishing *McRO* because the claims did not embody a "'new way' of storing, accessing, or naming files" or "create solutions to computer-centric problems"). The claims here are not directed to a combined order of specific rules that improve any technological process. The claims do not operate in any special technological environment or utilize specialized hardware. The claimed generic rate-limit rules can be applied in any way, in any environment and across any generic class of data packet. The bare idea of applying rate-limit rules to a stream of data claimed by the '507 patent amounts to an abstract idea.

### 1. **The claims are not directed to an improvement in computer functionality.**

The claims of the '507 patent recite no discernable improvement in computer technology. All elements of the claims, including controlling traffic streams with hierarchal rate-limiting; applying rate-limit checks based on packet classes; and implementing software or hardware for bandwidth borrowing from a parent class are old. Each of these concepts, alone or in combination, are admittedly well-understood, routine and conventional activities encompassed by the prior art. *See* '507 patent at 1:19-24 (admitting "[h]ierarchal rate-limiting [was already] used to control the flow of traffic streams … by subjecting a traffic stream to more than one rate-limit check [per class]); *see also* 1:51-55 (admitting "it [was already] possible to provide for oversubscription of certain classifications of traffic such that … the classification is permitted to borrow available bandwidth from … their parent classification").

9

The '507 specification boasts that the purported innovation is a theoretical hardware implementation used for borrowing bandwidth. *Id.* at 1:57-59 ("this type of borrowing is relatively easy to implement in software, [but] it is much more difficult to efficiently perform the same operation in hardware"); *see also* 2:26-28 ("in view of the need for efficient hierarchal rate-limiting, a hardware-based bandwidth borrowing scheme is needed"). While the specification may attempt to describe a potential advancement in hardware used for borrowing bandwidth, the claims do not. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019) ("the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, [but] the specification must always yield to the claim language in identifying that focus"). Claim 1 recites no discernable hardware components and is not limited to any specific technological or hardware environment. Claim 13, reproduced below, only recites generic components in purely functional terms.

> **13.** A system for rate-limiting a traffic stream using a rate-limit hierarchy at a network node comprising:
>
> a classification engine configured to identify a traffic classification of a packet;
>
> a rule selection engine configured to identify rules that apply to said traffic classification identified by said classification engine;
>
> first level-specific rule logic configured to subject said packet to a first rate-limit rule, said first rate-limit rule selected by said rule selection engine, said first rate-limit rule corresponding to a first-level traffic classification, and wherein said first level-specific rule logic determines an intermediate result for said packet at said first-level traffic classification in response to results of said first rate-limit;
>
> second level-specific rule logic configured to subject said packet to a second rate-limit rule, said second rate limit rule selected by said rule selection engine, said second rate-limit rule corresponding to a second-level traffic classification, wherein said second level-specific rule logic further comprises an infinity rate-limit rule logic, said infinity rate-limit rule logic granting an automatic pass to said packet in said second-level traffic classification regardless of whether or not said packet passes said second rate-limit rule, and wherein said second level-specific rule logic determines an intermediate result for said packet at said second-level traffic classification in response to results of said second rate-limit rule and results of said infinity rate-limit rule logic; and

> hierarchal rule logic configured to determine an overall result of said rate-limit hierarchy in response to intermediate results determined by said first and second level-specific rule logic.

The elements of claim 13, including the "classification engine"; the "rule selection engine"; the "first level-specific rule logic"; the "second level-specific rule logic" and the "hierarchal rule logic" are all generic, non-specific components described by way of function. The claims do not describe special purpose hardware, new components or new configurations used for borrowing bandwidth. The claims stop short and the specification "fails to provide any technical details for the tangible components [beyond] … purely functional terms." *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607, 612-613 (Fed. Cir. 2016) (concluding that the focus of the claims was not on improved hardware because the specification described the functionality of the hardware "in vague terms without any meaningful limitations").

### 2. <u>Federal courts and agencies have held similar rule-based claims abstract.</u>

The Federal Circuit, U.S. District Courts and the U.S. Patent Office have deemed a litany of similar claims applying generic access rules abstract. *See e.g.*, *Ericsson*, 955 F.3d at 1317 (claims for controlling access to computer resources held abstract and invalid); *see also Intellectual Ventures I*, 838 F.3d at 1316-18 (claims directed to the application of generic business rules for controlling delivery of email held abstract and invalid); *Smart Systems*, 873 F.3d at 1370-73 (claims directed to the application of generic fare rules for funding transit fares held abstract and invalid); *FairWarning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089, 1093-1095 (Fed. Cir. 2016) (claims directed to generating and applying rules to audit log data held abstract and invalid); *Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, 2015 WL 1941331 *7-9 (S.D.N.Y. 2015) (claims directed to applying access rules according to data contained in two or more packets held abstract and invalid); *Square, Inc. v. Protegrity Corp.*, CBM2014-00182, Paper 60, at 30-34 (U.S.P.T.O. Mar. 2, 2016) (claims directed to applying access rules to data held abstract and invalid). The claims of the '507 patent are broader and even more abstract than many of these examples. The claims merely apply generic rate-limit rules to a

stream of data without anything further.

## C. *Alice* Step Two: The Asserted Claims Do Not Contain an Inventive Concept.

The elements of the asserted claims, alone and in combination, use general computing components in a conventional manner to facilitate the fundamental and abstract concept of applying generic rate-limit rules or access rules to a stream of data. The claims contain no inventive concepts and fail step two of *Alice* for the following reasons.

### 1. The claims utilize conventional components to carry out an abstract idea.

Merely reciting the use of a generic computer or adding the words "apply it with a computer" does not convert a patent-ineligible abstract idea into a patent-eligible invention. *Alice*, 573 U.S. at 223. The claims and specification of the '507 patent do just that. The purported innovation described in the specification takes the conventional and well-known processes of hierarchal rate-limiting and borrowing bandwidth across traffic classes, and simply applies it in generic hardware. *See* '507 patent at 1:57-59 ("While this type of borrowing is relatively easy to implement in software, it is much more difficult to efficiently perform the same operation in hardware."); *see also* 2:26-28 ("in view of the need for efficient hierarchal rate-limiting, a hardware-based bandwidth borrowing scheme is needed"). The claims do not include any purported hardware innovation. *Two-Way Media,* 874 F.3d at 1339-39 (finding no saving inventive concept because the specification described a potential innovation in "scalable architecture" but the claims did not). The specification also falls short of describing any inventive concept in hardware for bandwidth borrowing or applying the infinity rate-limit check. The only mention of hardware in the specification is a system implemented in "application specific integrated circuits" and "content addressable memory." *See* '507 patent at 9:2-3; *see also* 9:9-10. Both are generic components completely divorced from any stated innovation.

Independent claim 1 recites no discernable hardware components. All components recited in claim 13, including the "classification engine"; the "rule selection engine"; the "first level-specific rule logic"; the "second level-specific rule logic" and the "hierarchal rule logic" are generic, non-specific components described by their function. *See Two-Way Media,* 874 F.3d at

1339 (finding no saving inventive concept in claims that use functional language to achieve these purported solutions.). In the same way method claim 1 applies one or more generic rate-limit rules in the abstract, system claim 13 applies the same abstract idea using general purpose and conventional computing components. The claims do not recite specialized hardware, hardware configurations or special-purpose components for borrowing bandwidth or applying the infinity rate-limit check. No inventive concepts exist.

### 2. The claims fail the "machine-or-transformation" test.

Although not dispositive, the "machine-or-transformation" test is a "useful and important clue" in the second step of the *Alice* framework. *Bilski v. Kappos*, 561 U.S. 593, 601, 604 (2010); *see also Smart Systems Innovations*, 873 F.3d at 1375. The test provides that a claimed process is patent-eligible if it "is tied to a particular machine or apparatus," or "transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008). Claim 1 fails both prongs. The method recites no discernable hardware components, is not limited to a specific technological or hardware environment and does not result in the transformation or creation of an article. Claim 13 recites wholly generic computing components and equally fails both prongs. '507 patent at claim 13 ("classification engine configured to identify a traffic classification"; "a rule selection engine configured to identify rules"; "first level-specific rule logic configured to subject said packet to a first rate-limit rule"; "second level-specific rule logic configured to subject said packet to a second rate-limit rule"; "hierarchal rule logic configured to determine an overall result"). Since claim 1 is tied to no machine and claim 13 recites only generic components, the claims fail the "machine-or-transformation" test and the second step of *Alice*. *See Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, 716 (Fed. Cir. 2014) (finding that a claim does not pass the *Alice* test or the "machine-or-transformation" test if it is "not tied to any particular novel machine or apparatus, [and] only a general purpose computer").

### D. The Dependent Claims Add Nothing More.

The remaining asserted claims are linked to the same abstract concept recited by the independent claims and add nothing more.

Claims 2, 15 and 16 recite granting an overall fail or pass based to the first-rate limit check or rule, underscoring the breadth of the independent claims. Granting a pass or fail based on a rate-limit check is not new and is a key component of conventional hierarchal rate-limiting systems. '507 patent at 1:36-37 ("In a hierarchal rate-limiting scheme, the traffic stream in question must satisfy rate-limit checks").

Claims 3, 14 and 17 recite implementing the process in generic hardware, a processer that is generic and generic hardware circuits, again illustrating the general-purpose computing environment in which the claims apply the abstract idea of applying generic rate-limit rules. Applying an abstract concept in generic hardware runs directly into patent eligibility restrictions set-out in *Alice*. *See Alice*, 573 U.S. at 223.

Claims 4, 5 and 18 recite implementing rate-limit checks/rules in parallel, but the background of the '507 patent describes conventional, prior art systems that implement rate-limit checks in parallel. '507 patent at 1:59-62 ("Implementing a rate-limiting borrowing scheme in hardware typically requires a 'series plus parallel' check on two rate-limit buckets.").

Claim 6 recites borrowing bandwidth from a first-level traffic classification, but borrowing bandwidth by traffic class with the use of rate-limit rules is an old and fundamental operation. *See* '507 patent at 1:51-55 (admitting "it [was already] possible to provide for oversubscription of certain classifications of traffic such that … the classification is permitted to borrow available bandwidth from … their parent classification").

Claims 7-9 and 19 recite the parent-child relationship between classes, adding nothing inventive. Claims 10-12 and 20 recite the well-known concept of prioritizing a packet by assigning a rate-limit priority. According to Federal Circuit precedent, classifying or prioritizing content is an abstract idea. *See In re TLI*, 823 F.3d at 609 ("claims [did] no more than the abstract idea of classifying and storing digital images in an organized manner").

Failing the subject-matter eligibility standards, all asserted claims are directed to the same abstract idea of ***applying generic rate-limit rules to a stream of data***, and the dependent claims add nothing more.

## V. THE '852, '024 AND '786 PATENT CLAIMS ARE INELIGIBLE UNDER § 101

As its response to Counts I-III of Proven's Complaint, alleging infringement of the '852, '024 and '786 patents, F5 hereby incorporates by reference and adopts Extreme Networks' Motion to Dismiss. For the reasons discussed in Extreme Networks' Motion to Dismiss, the claims of the '852, '024 and '786 patents fail both steps of *Alice* and are ineligible for patentability under Section 101.

## VI. CONCLUSION

For the foregoing reasons, F5 respectfully requests that the Court dismiss Proven's Complaint with prejudice for failure to state a claim and find the asserted claims of the Asserted Patents ineligible under 35 U.S.C. § 101.

Dated: June 25, 2020

VENABLE LLP

*/s/ Shane Brun*

By: SHANE BRUN
ALPER T. ERTAS
Attorneys for Defendant
F5 Networks, Inc.